UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID EDWARD SHAW,

               Plaintiff,                  Case Number 18-12973

v.                                      Honorable David M. Lawson

CITY OF FERNDALE, OFFICER JAMES
FARRIS, OFFICER JASON WHITE,
OFFICER CHRISTOPHER WIACEK,
LINDSAY MARIE MARACLE, and
ALLISON E. MARACLE,

               Defendants.

_____/

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT BY FERNDALE DEFENDANTS, DENYING MOTION FOR SUMMARY JUDGMENT BY MARACLE DEFENDANTS, AND DENYING JOINT MOTION TO ADJOURN SCHEDULING ORDER DATES

After being arrested and acquitted for assaulting and battering intoxicated, disrespectful, and unruly passengers that yelled racial slurs at him, Uber driver David Edward Shaw sued the City of Ferndale and three of its officers alleging constitutional violations, and his two passengers for state law torts. Both groups of defendants moved for summary judgment. The plaintiff insists that genuine issues of material fact exist. But the factual record shows that the police officers responded appropriately, and the City did not commit any constitutional violations. The Ferndale defendants' motion will be granted. The case against the two passengers is not so clear; the record contains conflicting facts that must be resolved at trial. That summary judgment motion will be denied.

I.

On January 24, 2016, Shaw began taking Uber fares around 1:15 a.m. and accepted a request in Ferndale, Michigan. Shaw pulled up to Rosie O'Grady's, a local bar, between 1:30 and 2:00 a.m., but he accidentally stopped at a "no standing zone." A police cruiser shined a spotlight

on Shaw's car, so he drove away from the zone to avoid tickets. As Shaw drove off, intending to turn around to pick the passengers up, he received a call from Lindsey Johnston, who was intoxicated and yelled at Shaw to "get your ass back here."

Shaw eventually returned to the same spot in front of Rosie O'Grady's, picked up "two or three people," and began to drive off. At that point, "somebody" — either Allison or Lindsay Maracle — started screaming, "hey, wait, don't pull off. Some more people are coming." Shaw tried to explain that he nearly received a ticket for stopping at that spot, and "whoever was sitting behind" Shaw started to get "disrespectful." The rest of the group then entered the car, and Shaw drove off with Lindsay Maracle, Allison Maracle, Lindsey Johnston, Jennifer Trainor, Emily Szewc, and Shawn MacQuillan.

As the ride progressed, Shaw and at least one of the group members began exchanging words. One of the passengers complained that the car smelled like "weed." Shaw remained silent to avoid discussing the fact that he forgot his medical marijuana in his car. But defendants Lindsay and Allison Maracle allegedly began yelling remarks at Shaw, like "[y]ou're nothing but an Uber driver. Take us home" and "I don't expect to hear any backtalk from you . . ." Shaw allegedly tried to calm the passengers down, but they continued to yell at him, calling him "boy" and a "nothing Uber driver."

Shaw then decided to end the ride because he thought the passengers disrespected him and pulled over in front of the Magic Bag in Ferndale, Michigan. When Shaw asked the passengers to leave his car, they became irate and began screaming that he was not going to have a job after the night.

Johnston then recorded the altercation on her cellphone, which depicts the following:

0:00-0:20: Shaw sat in the driver's seat using his phone, while passengers can be heard yelling "get a picture of his face," "bye mother f*cker," "I paid you, I f*cking

paid you," and "I bet you won't have a job after this." Shaw responded by calling someone a "b*tch."

0:20-0:23: Johnston and others exit the car. Two doors can be heard closing. Johnston moved to the back of Shaw's car.

0:24-00:45: Shaw confronted the passengers, admonishing them for slamming his doors and calling them "drunk and obnoxious." The passengers denied slamming his door. Shaw then returned to the driver's seat.

00:46-00:53: The passengers yelled at Shaw, "why you gettin' upset, boy?" and "get in your f*cking car and go, b*tch. Bye."

00:54-1:11: A single thump can be heard (unsure if this was beating on the car or if it was the sound of Shaw closing his door). Shaw then darted toward Ms. Johnston and the camera was swiped away. The screen goes dark. Audible female screaming: "Are you f*cking kidding me?" "N*gger." Then high-pitched shrieking and crying.

1:12-:130: Video restored. Shaw picked his hat up and yelled, "f*ck all y'all. Yeah!" Allison Maracle then tried to push Shaw, but he shoved her back (much harder), causing her to fall in the street. The parties then yelled profanities at each other.

1:30-4:31: The parties continued to yell back and forth, calling each other intoxicated and threatening to call the police. Shaw continued to yell at the passengers to stay away from his car and appeared to be trying to call someone on his phone. A man can be seen restraining a woman (both unidentifiable).

4:32-5:08: Police arrive. Shaw explained to Officer Wiacek that people kicked the back of his car and attacked him. Passengers denied kicking the car. Someone told police they were recording. The Officer responded "okay, let me take a look at it." Video cut off.

Passenger Szewc had called 911 and reported that the group's Uber driver assaulted her female friends, pushed three of them in the street, and punched another in the face. The Ferndale Police Department dispatched its officers, advising that an Uber driver assaulted his fares. Officer Christopher Wiacek (the officer depicted in the video) arrived on the scene and approached Shaw. Officer James Farris arrived at the same time as two other officers and found Allison Maracle crouched over Lindsay, who was crying loudly and holding her head. Shaw spoke to officers

Wiacek and Farris, telling them that the patrons attacked his car, then attacked him and that he was acting in self-defense.

After reviewing the video, the officers huddled, exchanged information provided by the witnesses, and decided to arrest the plaintiff for assault and battery. Officer Farris handcuffed the plaintiff and put him in a police car. Officer Jason White searched the plaintiff's car and found several baggies of marijuana in the plaintiff's locked glove box. Although the plaintiff had a valid medical marijuana card, Officer Farris believed that the plaintiff had illegally transported the marijuana.

Officer Farris drove Shaw to the Ferndale Police Department, where he was booked, processed, and placed in a holding cell. At that point, Shaw says that he "almost had a panic attack" — he was breathing heavily, felt nauseous, and his head was spinning. Officer Farris walked by Shaw while he was crying in the holding cell. Shaw was released on bond that night "within an hour or so."

Meanwhile, other officers drove the passengers to the Ferndale police department, where they were taken to a room. Each of them wrote a statement.

Officer Farris's police report, drafted from memory, noted that Shaw exited his car to "defend himself" and that a "scuffle occurred" when he was trying to protect his car. He also wrote that officers found marijuana in a locked glove box and that Shaw had a medical marijuana card.

After the incident, Lindsay Maracle's attorney reached out to Channel 4 News to publicize the incident. Channel 4 then broadcasted a one-sided story about the scuffle on February 5, 2016, which included Shaw's name and photograph, as well as a short clip of the cellphone footage. The story framed Shaw as the aggressor and kept the passengers' identities confidential.

Lindsay Maracle also sued Uber after the incident. Less than two months after the incident, Uber paid her $15,000 and Maracle signed a non-mutual release agreement. Shaw did not know about the release, nor did he sign it.

On January 26, 2016, Ferndale's City Attorney charged Shaw with assault and battery, and possession of marijuana. The marijuana charge was voluntarily dismissed at the arraignment, and a jury found him not guilty of assault and battery at trial on September 21, 2016, where all the passengers testified.

Shaw alleges that he sustained emotional injuries from the incident, the news media coverage, and the trial that persist to this date. He says that he suffers from constant nightmares, paranoia, post-traumatic stress disorder (PTSD), insomnia, the fear of leaving his home, loss of reputation, and the inability to find suitable employment. Shaw sought medical treatment for the emotional and psychological trauma suffered from the ordeal, although he had pre-existing treatment for anxiety.

Shaw originally brought suit against all the officers at the scene and at the jail, and all the passengers in his car that night. He agreed to dismiss some of the defendants. Those that remain are City of Ferndale and Officers Farris, White, and Wiacek (the Ferndale defendants), and Lindsay and Allison Maracle. He accuses the Ferndale defendants of false arrest and imprisonment (Count I), wrongful detention, and unconstitutional conditions (Count II), civil conspiracy (Count III), malicious prosecution (Count IV), all under federal law; and false arrest and imprisonment (Count VI) and gross negligence (Count VIII) under state law. He says the City of Ferndale failed to train and supervise its police officers (Count V). And he brings a claim for intentional infliction of emotional distress (Count VII) against all defendants, including the Maracle sisters.

All defendants have moved for summary judgment.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). Instead, that party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for" that party. *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. Federal Claims Against Ferndale Defendants

Shaw's federal claims are advanced via 42 U.S.C. § 1983. Therefore, he must prove that he was deprived of a right secured by the Constitution or laws of the United States by someone acting under "color" of law. *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The plaintiff must establish the liability of each defendant by that person's own conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

The police officers certainly were acting under color of their state-conferred authority. But they contend that Shaw's federal claims against them are barred by qualified immunity.

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). That affirmative defense protects government actors performing discretionary functions from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). The plaintiff must clear both hurdles, but the Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (abrogating in part *Saucier*, 533 U.S. at 201).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard into each step of the qualified immunity analysis. *Scott v. Harris*, 550 U.S. 372, 378 (2007). That means that the court must view the facts in the light most favorable to the plaintiff, *Saucier*, 533 U.S. at 201; "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

### 1. False Arrest and Imprisonment

The Fourth Amendment clearly establishes Shaw's right to be free from "unreasonable . . . seizures," U.S. Const., amend. IV (although for qualified immunity, the analysis of the right must be more granular, *Saucier*, 533 U.S. at 201 ("[t]his inquiry . . . must be undertaken in light of the specific context of the case, not as a broad general proposition")). And a warrantless arrest can be unreasonable, but not "if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988).

To determine whether an officer had probable cause to make an arrest, the Court examines "whether at that moment the facts and circumstances within [the officer's] knowledge and of which [the officer] had reasonable trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Donovan v. Thames,*

105 F.3d 291, 298 (6th Cir. 1997) (quoting *Beck v. Ohio,* 379 U.S. 89, 91 (1964)) (citations omitted).

"Probable cause is generally defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'" *United States v. Copeland,* 321 F.3d 582, 592 (6th Cir. 2003) (quoting *United States v. Ferguson,* 8 F.3d 385, 392 (6th Cir. 1993)). Probable cause "'is a flexible, commonsense standard [that] requires that the facts available to the officer would warrant a man of reasonable caution' to believe that a crime is afoot." *Ibid.* (quoting *Texas v. Brown,* 460 U.S. 730, 742 (1983)). The court must review the "totality of the circumstances from the perspective of the officer at the time of the incident" when deciding whether probable cause existed. *Ibid.*

Police officers who arrive at the scene of a disturbance after much of the dust settles are faced with the unenviable task of sorting through competing stories and then making a quick decision of whom to arrest. Take *Klein v. Long*, 275 F.3d 544 (6th Cir. 2001). There, the victim called 911 to report domestic abuse. 275 F.3d at 550. When officers arrived, they found the victim visibly upset, and she informed them that her husband (the plaintiff) pushed her, grabbed her children, prevented her from calling the police, and cut her finger. *Ibid.* The officers saw a cut on her finger and arrested her husband. *Ibid.* The husband argued that the officers did not have probable cause to arrest him because "they failed to perform a reasonable investigation" when they did not question him. *Ibid.* Although the Sixth Circuit held that a police officer "must take into account all the evidence — both the inculpatory and exculpatory — that he has at the time of arrest," the court concluded that the officers had probable cause to arrest the husband for domestic assault and reversed the district court's denial of summary judgment for the officers. *Id.* at 552.

As an aside, the Ferndale defendants say that because only Farris actually arrested Shaw, this count should be dismissed against White and Wiacek, who merely reported to the scene. But there is enough evidence to show that all three collaborated on the decision, so they are all responsible for the arrest at this stage of the case. *See Garcia v. Thorne,* 520 F. App'x 304, 307 (6th Cir. 2013).

Shaw was arrested for assault and battery under Ferndale's ordinance, which mimicked state law. Under Michigan law, an assault is "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery." *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009) (quoting *People v. Nickens*, 470 Mich. 622, 685 N.W.2d 657, 661 (2004)). A battery is "an unintentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *Id.* (quoting *Nickens*, 685 N.W.2d at 661).

Upon arriving at the scene and listening to the different parties' accounts of the altercation, Officer Farris watched the video recorded on Johnston's cell phone. The footage shows Shaw exchanging heated words with his passengers, exiting his vehicle, and striking the phone out of Johnston's hand. A woman's screaming and crying can also be heard on the video. In addition to viewing the video, passengers reported that Shaw struck Lindsay Maracle, dispatch reported that an Uber driver attacked his fares, and Officer Farris found Lindsay on the ground crying. The video shows that Shaw probably was not the first to use derogatory language. But it gives plausible evidence that he was the initial physical aggressor as he exited his vehicle to confront the person whom he believed kicked his car.

These facts are undisputed, and they are sufficient to establish probable cause for Shaw's arrest. In fact, unless there is an apparent reason for the officer to discredit the witness, "[a]n eye

witness's statement that he or she saw a crime committed or was the victim of a crime is generally sufficient to establish probable cause." *United States v. Shaw*, 464 F.3d 615, 623 (6th Cir. 2006); *see Courtright v. City of Battle Creek*, 839 F.3d 513, 521-22 (6th Cir. 2016).

Shaw disagrees. He contends that the officers failed to conduct a reasonable investigation and failed to consider exculpatory information. It is undisputed, he says, that the officers observed him being cooperative and sober, and witnessed that the passengers were clearly intoxicated. Shaw also takes issue with the fact that none of the police officers watched the entire video at the scene; Officer White testified that he watched the video "to the point of the assault and then a little bit further but not after that" because "there was no allegations made" that the video contained any more relevant information. And that, Shaw says, resulted in their failure to account for exculpatory information by failing to consider any of Shaw's repeated claims that he was acting in self-defense.

That does not change the conclusion, however, that probable cause existed to arrest Shaw for assault and battery. First, the officers did not need actually to see the physical confrontation to establish probable cause. In *Klein*, for example, the Sixth Circuit held that the officers had probable cause upon hearing reports from the victim and her children and seeing the victim's cut finger. *Klein*, 275 F.3d at 552. Second, the fact that the plaintiff was sober, and the passengers were not, does not nullify the video footage and corroborating evidence — the witness reports and seeing Lindsay on the ground, crying. Third, Officer White's belief was correct: the video provided no other relevant information for making the arrest; it merely shows the parties exchanging heated words until officers arrived at the scene. Fourth, although White did testify at his deposition that he did not "clearly see the assault" on the video, he subsequently responded, "I do," when asked whether he "clearly [saw] Mr. Shaw strike anyone." He clarified that "you see his body change, shift towards [Ms. Johnston]. You see a movement in his left shoulder, and the

phone goes up. Do you see the hand hit the camera? No, but there is definitely a definite motion before the camera is—tumbles that would indicate an assault." Finally, the plaintiff is correct that police officers may not ignore exculpatory evidence, but they are under no obligation to give any credence to a suspect's story. *Klein*, 275 F.3d at 552.

The plaintiff insists that a genuine issue of material fact exists regarding whether he struck Johnston. Perhaps, but that is beside the point in light of the witness's on-the-scene statement to Officer Farris. *Shaw*, 464 F.3d at 623. Moreover, the video cuts against this argument, showing that Shaw approached Johnston and swiped at her camera. And even if the video is not entirely clear about whether Shaw made the first strike, the totality of the circumstances at the time of the arrest indicated that the plaintiff probably committed an assault and battery. *See District of Columbia v. Wesby*, --- U.S. --- 138 S.Ct. 577, 586 (2018) (probable cause is a "fluid concept" that "deals with probabilities and depends on the totality of the circumstances."); *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011) ("A [police officer] is entitled to qualified immunity" on a false arrest and false imprisonment claim "if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the [police officer].").

The officers did not violate Shaw's federal constitutional rights by arresting him and taking him to jail. Count I of the amended complaint will be dismissed.

### 2. Unconstitutional Conditions and Deliberate Indifference Claim

In Count II of the amended complaint, Shaw alleged that the Ferndale defendants ignored his "serious medical needs by showing deliberate indifference and callous disregard" to his panic attack and subjected him "to cruel and unusual punishment and unconstitutional conditions" by isolating him from his family in violation of "the Fourth and Fourteenth Amendments." Shaw

later dismissed his deliberate indifference claim with prejudice on September 19, 2019. *See* ECF No. 84.

In their motion for summary judgment, the Ferndale defendants point out that the plaintiff cited the wrong constitutional provision. Unconstitutional conditions claims arise under the Eighth and Fourteenth Amendments. *Thompson v. County of Medina*, 29 F.3d 238, 242 (6th Cir. 1994). The defendants then argued that the officers are entitled to qualified immunity because there "is no absolute constitutional right to visitation of family members under the Eighth Amendment," citing *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir. 1984).

In response, Shaw addressed only his deliberate indifference claim, despite previously stipulating to dismiss it. He never addressed, or even fleetingly mentioned, his unconstitutional conditions claim or the defendants' argument that there is no constitutional right to visitation. To the extent that the claim survived the order of dismissal, it now is waived. *See Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013) (The plaintiff's "failure to respond to Defendants' attack on its standing [in their motion to dismiss] and its failure to refute the assertion that it had been fully reimbursed amounts to a waiver of the argument"); *see also Humphrey v. United States Attorney Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) ("[W]here, as here, plaintiff has not raised arguments in the district court by virtue of his failure to oppose defendants' motions to dismiss, the arguments have been waived."); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 299 (3d Cir. 2012) ("It is not the district court's responsibility to help a party correct an error or a poor exercise of judgment.").

Count II of the amended complaint will be dismissed.

### 3. Malicious Prosecution

Shaw also alleged in his amended complaint a claim for malicious prosecution against the Ferndale defendants. "The Sixth Circuit 'recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,' which 'encompasses wrongful investigation, prosecution, conviction, and incarceration.'" *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) (quoting *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006)). Malicious prosecution claims are "entirely distinct" from false arrest claims, as the malicious-prosecution cause of action "remedies detention accompanied not by absence of legal process, but by wrongful institution of legal process." *Wallace v. Kato,* 549 U.S. 384, 390 (2007).

To succeed on a malicious prosecution claim under the Fourth Amendment, the plaintiff must demonstrate: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted).

"The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Ibid.* A police officer can be found liable for malicious prosecution when he knowingly submits false information to the prosecutor that formed the basis of the charging decision. *Sykes v. Anderson*, 625 F.3d 294, 315-16 (6th Cir. 2010).

Shaw premises this count of the amended complaint on alleged false statements by Officer Ferris in his police report and Ferris's allegedly false testimony at Shaw's criminal trial. But he identifies nothing that Ferris said or wrote that was false in any material way.

Shaw's main criticism of the police report is its omission of certain facts: that (i) the passengers were intoxicated, (ii) a video of the incident was created; (iii) a female is seen in the video physically attacking Shaw; (iii) Shaw physically retreated from the attack; (iv) Shaw told Wiacek that he was attacked; and (iv) that the passengers slung racial slurs at Shaw. The police report, however, contained no misrepresentations or material omissions. Shaw argued that the report included a deliberate falsehood by stating that "Shaw claimed a scuffle occurred when he was attempting to defend his car." That is not a misrepresentation — Shaw testified at his deposition, "I was defending my vehicle and I was defending myself." Shaw also testified that the police report neglected to mention that the incident was caught on camera. That is not true. The report states, "Johnston captured a portion of the incident on her cell phone by using her video camera."

Next, Shaw argues that the report neglected to mention that the passengers were drunk. But the fact that the passengers were drunk does not diminish the probable cause for Shaw's arrest and trial for assault and battery, especially because the passengers filmed the incident that caused the officers to arrest the plaintiff. Finally, Shaw argued that Farris did not include information about the passengers calling him "boy," "n*gger" or a "nothing Uber driver." But the plaintiff provided no argument, nor cited any authority demonstrating, that this information is material to the assault charge. Moreover, Shaw provided no evidence that the officer was aware that the passengers said those things; Officer Farris explained that the video was hard to hear at the scene

because it was recorded on a cellphone, and the incident took place on Woodward Avenue, a loud road, especially with noises from nearby bars on a Saturday night.

Shaw also referenced the search warrant for his car. But he pointed to no misrepresentations or omissions in it. And he did not explain how the warrant would have affected the prosecutor's decision to prosecute him. In fact, Officer Farris testified that he found "nothing of significance" after executing the warrant; rather, the marijuana was found as a result of the search incident to arrest.

Likewise, Shaw's contention that Officer Farris lied under oath during Shaw's criminal trial is wrong. Farris did not lie about the plaintiff's allegation that he was defending his car; Shaw acknowledged that. Shaw also argued that Farris did not inform him that he was arrested and charged with assault and battery and possession of marijuana. Not only is that contention irrelevant to whether Ferndale established probable cause to arrest and charge the plaintiff, but the record contradicts it. Shaw himself testified that Officer Farris said, "[y]ou're being charged with assault and battery and possession of marijuana," before the officer drove him to the police department for booking.

The facts in their most favorable light to Shaw do not support a malicious prosecution claim. Count IV of the amended complaint will be dismissed.

### 4. Civil Conspiracy

Shaw contends in Count III of the amended complaint that the Ferndale defendants conspired with one another to violate his federal rights. A civil conspiracy under section 1983 is "'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)). To prevail, the plaintiff must offer evidence that (1) a single plan existed; (2) the alleged conspirators shared in the general conspiratorial objective

to deprive the plaintiff of his constitutional or federal statutory rights; and (3) an overt act was committed in furtherance of the conspiracy that caused injury. *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Bazzi*, 658 F.3d at 602.

But the plaintiff's claims for conspiracy depend on the viability of the underlying substantive section 1983 and state law claims. "[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to prove a separate, actionable, tort." *Petroleum Enhancer, LLC v. Woodward,* 690 F.3d 757, 769 (6th Cir. 2012) (quoting *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.,* 157 Mich. App. 618, 632, 403 N.W.2d 830, 836 (1986)). The plaintiff's other constitutional tort claims against the Ferndale defendants are not viable. Therefore, the conspiracy claim in Count III will be dismissed.

### 5. Failure to Train

Shaw contends that the City of Ferndale is liable for the constitutional violations asserted under a failure-to-train and failure-to-supervise theory. To prevail on a section 1983 "failure to train" claim, the plaintiff must show that the "training program is inadequate to the tasks that officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is closely related to or actually caused the plaintiff's injury." *Hill v. McIntyre,* 884 F.2d 271, 275 (6th Cir. 1989) (internal quotes and citations omitted). However, it is well-settled that where a municipality's liability is based on the alleged unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm. *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (observing that "neither *Monell* . . . nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of

one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm").

Because no such constitutional violation has been shown, summary judgment will be granted in favor of the City on Count V of the amended complaint.

### B. State Law Claims Against Ferndale Defendants

Counts IV, VII and VIII of the amended complaint plead claims against the Ferndale defendants for malicious prosecution, intentional infliction of emotional distress, and gross negligence.

The malicious prosecution claim fails for the reasons discussed above: the officers established probable cause to arrest Shaw and the officers did not provide any material misrepresentations or omissions to prosecutors. *See Peterson v. Novelties, Inc. v. City of Berkley*, 258 Mich. App. 1, 673 N.W.2d 351 (2003).

To prove a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that (1) the defendant's conduct was extreme and outrageous, (2) the plaintiff suffered severe emotional distress, (3) there is a causal nexus between the defendant's conduct and the plaintiff's emotional distress, and (4) the defendant intended to or was reckless in causing severe emotional distress. *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 149 (2013).

Shaw has not offered evidence that establishes the first element against the Ferndale defendants. He argues that instead of arresting the passengers for attacking him, the officers arrested Shaw for defending himself. But as explained above, the officers had probable cause to arrest Shaw for assault and battery; therefore, they did not act in an extreme or outrageous manner. *See Walsh v. Taylor*, 263 Mich. App. 618, 634, 689 N.W.2d 506, 517 (2004) (because the officer established probable cause to arrest the plaintiff, "as a matter of law he cannot be liable for

intentional infliction of emotional distress."). Evidence on the fourth element is wanting as well: no facts suggest that any officer intended to cause him severe emotional harm by arresting him. *See Lewis v. LeGrow*, 258 Mich. App. 175, 197, 670 N.W.2d 675, 689 (2003) (the plaintiff must show that a defendant specifically intended to cause him or her severe emotional harm).

The plaintiff's gross negligence claim fares no better. Gross negligence under Michigan common law "means wantonness and disregard of the consequences which may ensue." *People v. Soares*, 488 Mich. 918, N.W.2d 854, 855 (2010). "Wantonness, in turn, means conduct indicating that the actor is aware of the risks but indifferent to the results and usually suggests a greater degree of culpability than recklessness." *Ibid.* (citations omitted).

In support of his gross negligence claim, the plaintiff merely states that "[q]uestions of fact exist as to whether Ferndale defendants were grossly negligent." But Shaw has accused the Ferndale defendants only of intentional conduct, which does not amount to gross negligence. *See VanVorous v. Burmeister*, 262 Mich. App. 467, 483, 687 N.W.2d 132, 143 (2004). Even if the Court construes Shaw's response to mean that the officers negligently investigated the incident, the argument fails because Michigan does not recognize a claim against police officers for negligent investigation. *Flores v. Dalman*, 199 Mich. App. 396, 403, 502 N.W.2d 725, 729 (1993) (the defendant officer's "duty to the public is to detect and investigate crime; no duty is owed to plaintiffs as individuals [absent a special relationship]. Without a duty, there can be no negligence.").

Summary judgment on Counts IV, VII and VIII of the amended complaint will be granted as to the Ferndale defendants.

C.  State Law Claim Against the Maracle Defendants

Shaw's only claim against his drunken passengers is that they intentionally inflicted emotional distress upon him by peppering him with racial invective, pressing false charges, and instigating media reports that targeted him as a rogue Uber driver.  The Maracles argue three points, which, they say, entitle them to summary judgment: (1) their conduct was not "extreme" or "outrageous," so the claim fails as a matter of law; (2) Shaw did not prove that his emotional distress was caused by their conduct instead of his pre-existing emotional difficulties; and (3) the release Lindsay Maracle  signed with Uber bars the claim.

This last argument may be dismissed out of hand.  Shaw never signed the release with Uber.  It was not a mutual release.  The document did not even mention him.  "An agreement to settle a pending lawsuit is a contract, governed by the legal rules applicable to the construction and interpretation of other contracts."  *Reicher v. S.E.T. Enters.*, 283 Mich. App. 657, 664, 770 N.W.2d 902 (2009).  A nonparty to an agreement may not be bound by its terms.  *AFSME Council 25 v. Wayne County.*, 292 Mich. App. 68, 81, 811 N.W.2d 4, 12 (2011).

The other two arguments require a more fulsome discussion of the tort of intentional infliction of emotional distress (IIED).

Although the Michigan Supreme Court has not yet recognized the tort of intentional infliction of emotional distress, the Michigan Court of Appeals has consistently accepted it.  *Mroz v. Lee*, 5 F.3d 1016, 1018 (6th Cir. 1993) (collecting cases).  As noted above, to find success, a plaintiff must prove extreme and outrageous conduct by the defendant, which caused severe emotional distress, and the defendant intended to inflict that distress.  *Lucas*, 299 Mich. App. at 359, 830 N.W.2d at 149; *see also Ruffin-Steinback v. dePasse,* 267 F.3d 457, 464 (6th Cir. 2001) (quoting *Andrews v. Prudential Secs., Inc.,* 160 F.3d 304, 309 (6th Cir. 1998)).  "The outrageous

conduct requirement is satisfied only by conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Liability arises, moreover, only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Andrews*, 160 F.3d at 309 (citations and quotations marks omitted).

The Maracle sisters' hate speech, while regrettable and disgusting, will not establish the conduct element. "[M]ere insults, indignities, threats, [or] annoyances" do not reach this threshold as a matter of law. *Lucas,* 299 Mich. App. at 359, 830 N.W.2d at 149; *but see Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 938 (6th Cir. 2000), *rev'd on other grounds in Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843 (2001) (reversing grant of summary judgment for the defendant on IIED claim where male employees, among other things, routinely referred to women as "b*tches," "c*nts," "heifers," and "split tails.").

Even so, the Michigan Court of Appeals has found that although "[i]n certain contexts, a racial or ethnic slur may not be extreme and outrageous," the use of racial slurs, in conjunction with other abuses, may present genuine issues of material fact that preclude summary judgment. *Ledsinger v. Burmeister*, 114 Mich. App. 12, 20, 318 N.W.2d 558, 562 (1982). In *Ledsinger*, the plaintiff contracted to purchase auto parts from the defendant and made a down payment. *Id.* at 15, 318 N.W.2d at 560. But when the plaintiff and his wife returned to the defendant's shop, the defendant increased the price beyond the terms written in the contract. *Ibid.* When the plaintiff protested, the defendant called the plaintiff a "n*gger" and told him that he should get his "black ass" out of the store, which caused the plaintiff humiliation, mental anguish, and intense anxiety. *Ibid.* The Michigan Court of Appeals reversed the lower courts grant of summary judgment of the defendant because "the racial slurs in the instant case, taken in the context in which they were

made, could be considered by a trier of fact to be extreme and outrageous." *Id.* at 20, 318 N.W.2d at 562.

Here, according to the facts seen in Shaw's best light, the defendants' abuse began as soon as they entered Shaw's car and escalated until he tried to terminate the ride. It did not stop then; instead it turned uglier, with the defendants using racial epithets as insults and belittlements. They threatened his livelihood. And then the defendants pressed charges, allegedly mischaracterizing Shaw as the aggressor. And finally, the Maracles took to the media, calling out Shaw by name to publicly excoriate him in an act of revenge. It takes little imagination to see how a jury could view that conduct as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 149 (2013); *see Miller v. Currie*, 50 F.3d 373, 378 (6th Cir. 1995) (reversing dismissal of plaintiff's IIED claim against nursing home that "hid" her mother from her on visits); *Chesher v. Neyer*, 477 F.3d 784, 802 (6th Cir. 2007) (allowing IIED claim to go to jury where morgue used photographs of grieving family members in campaign literature).

The defendants also assert that because the plaintiff experienced other emotional upheavals in his life — marital problems resulting in a divorce from a mentally abusive spouse — he cannot prove that his current emotional pain was caused by the defendants. However, Shaw produced evidence that he sought and received medical treatment for the emotional and psychological trauma caused by this ordeal. Under Michigan law, a plaintiff need only prove that a defendant's conduct was "a" proximate cause of his injuries. *Orzel v. Scott Drug Co.,* 449 Mich. 550, 566-567, 537 N.W.2d 208, 216 (1995). And the issue of proximate cause normally presents a question to be decided by the trier of fact. *Dep't of Transportation v. Christensen,* 229 Mich. App. 417, 424, 581 N.W.2d 807, 811 (1998).

Moreover, the pre-existing condition evidence can cut both ways. Generally, a tortfeasor is liable for all injuries arising directly from the commission of a wrongful act, whether foreseeable or not, provided that the damages are the legal and natural consequences of the wrongful act. *Ensink v. Mecosta Co. Gen. Hosp.,* 262 Mich. App. 518, 524, 687 N.W.2d 143, 147 (2004) (citing *Sutter v. Biggs,* 377 Mich. 80, 86-87, 139 N.W.2d 684, 686 (1966)). A torfeasor is liable for aggravation of a pre-existing condition of the plaintiff. *Wilkinson v. Lee,* 463 Mich. 388, 396-397, 617 N.W.2d 305, 309 (2000) (citing 2 Restatement, 2d, Torts, § 461, p. 502).

The claims against the Maracle defendants in Count VII of the amended complaint must be resolved at trial.

One last point deserves mentioning. The Maracle defendants argue that if the federal claims against the Ferndale defendants are dismissed, as they will be here, the Court should decline to exercise supplemental jurisdiction and dismiss the state law claims against them. The Court has discretion to dismiss state law claims when the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). That discretion is informed by "the 'values of judicial economy, convenience, fairness, and comity.'" *Gamel v. City of Cincinnati*, 625 F.3d 949, 952 (6th Cir. 2010) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Frequently, the balance tips toward declining jurisdiction where only state law claims remain and there is no diversity jurisdiction. *Ibid.* (quoting *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254–1255 (6th Cir. 1996)). But it tilts the other way when (1) the case has been on the court's docket for a while; (2) discovery has closed; (3) summary judgment motions have been filed and are ripe for review; or (4) the district court was familiar with the facts of the case and invested significant time in the litigation. *See Harper v. Auto Alliance Int'l*, 392 F.3d 195, 211-12 (6th Cir. 2004); *Taylor v. First Am. Bank-Wayne*, 973 F2d 1284 (6th Cir. 1992).

This case has been on the Court's docket since September 21, 2018, the discovery closed on August 29, 2019, the case is before the Court on the defendants' motions for summary judgment, and the Court has apprised itself of the facts of the case and has invested significant time in the matter. Neither comity nor judicial economy favors dismissal of a trial-ready case in its present posture.

The motion for summary judgment by defendants Lindsay and Allison Maracle will be denied.

### III.

The plaintiff has not offered evidence that creates a material fact question on any of the claims against the Ferndale defendants. However, fact questions preclude summary judgment on the remaining count of the amended complaint against the Maracle defendants. The parties have filed a joint motion to enlarge the remaining case deadlines because the summary judgments remained pending. Because this opinion resolves those motions, there is no cause to tamper with those deadlines.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendants City of Ferndale, James Farris, Jason White, and Christopher Wiacek (ECF No. 83) is **GRANTED**. The amended complaint is **DISMISSED WITH PREJUDICE** as to those defendants, only.

It is further **ORDERED** that the motion for summary judgment by defendants Lindsay and Allison Maracle (ECF No. 76) is **DENIED**.

It is further **ORDERED** that the joint motion to adjourn scheduling order dates (ECF No. 133) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 20, 2020

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on March 20, 2020.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI